## DETHRAGE *et al. v.* CITY OF ROME.

1. Where, in an action for damages on account of personal injuries, the
case turned upon the question of whether the deceased by the exercise
of ordinary care could have avoided the injury, and the evidence did not
show such conduct upon the part of the deceased as to amount to negli-
gence per se, the question was one of fact for the jury; and in such
case, after two concurrent verdicts for the plaintiff on the same state
of facts, and where under all of the evidence the verdict is not mani-
festly wrong, the trial judge should not, in the exercise of his discre-
tion, grant a second new trial.

2. A new trial was not authorized on the grounds of the alleged errors in
the portions of the charge of the court excepted to by the defendant.

Argued January 22,—Decided July 5, 1906.

Action for damages.    Before Judge Henry.    Floyd superior
court.    March 20, 1905.

The plaintiffs brought suit against the City of Rome for dam-
ages on account of the death of their father, alleged to have been
caused by a defective street.    They obtained a verdict for $1,500,
but on motion of the defendant, grounded on the insufficiency of
the evidence to sustain it and on errors of law committed in the
charge of the court, the verdict was set aside and a new trial
granted.    A second verdict was obtained by the plaintiffs and was
set aside by the trial court.    The exception is to the decision grant-
ing the defendant the second new trial.    From the evidence it ap-
pears that the deceased had been engaged in the business of selling
meat from his wagon to customers residing along the streets, and,
for a period of some two months prior to the time of his death,
had traveled as often as twice a week the street on which he was
fatally injured.    At the place of the injury the street is situated on
the side of a hill, and for a distance of several hundred feet is bor-
dered on one side by a precipitous ravine fifteen feet, more or less,
in depth.    The width of the street is normally 66 feet, though it is
reduced by the ravine cutting into it to a width of 38 feet at one
point, from which it again increases in both directions to its

regular width, and at a distance of about 100 yards on both sides of this point the roadway is free from danger. The deceased on the day of the injury was driving a pony which he knew to be of a fractious temperament. He had been warned by the former owner, at the time he bought it, that it was not a safe animal for him, he being past middle age, and partially crippled in his lower limbs. A few days before the injury it had run away, with someone else driving, and had broken his wagon. On the day in question it had backed the wagon up on a sidewalk in such a way that the driver could not get it back in the road without calling for Dethrage's assistance. It was while driving the animal hitched to his meat wagon that the deceased tried to "turn around" at the narrow part of the road above described. There was no railing or sidewalk between the roadway and the edge of the precipice, which was about 12 or 15 feet deep at this point, but trees growing along the road formed a partial protection. Two eye-witnesses for the defendant testified that three efforts were made to turn, and with each effort the horse surged further and further back, till on the third trial the rear wheel dropped over the root of a tree, upsetting the wagon and throwing the deceased out, his leg catching under the body of the wagon, and his head being hurled down the side of the precipice striking against a sewer-pipe and crushed in such a manner that his death resulted in a few days. The boy who was in the wagon with the deceased testified as follows: "Mr. Dethrage was going up towards Seventh avenue, and started to turn. The horse got scared at the jail when he was going that way, . . and when he got scared Mr. Dethrage went to whipping, and told him 'bet you will go,' and the horse wouldn't pay any attention to him, and the horse backed off the ditch and threw him off and throwed me through the fence crack. Mr. Dethrage was trying to turn back this way. Before he tried to turn he was going up West First street." An eye-witness for the plaintiff testified that when he saw the occurrence the horse was in the act of turning, and that the deceased was hollering "Whoa," but neither he nor the other eye-witnesses testified anything as to the whipping.

The special grounds of the motion for new trial assign error upon the following charges of the court: (1) "I charge you that if you find all of the facts necessary for the plaintiff to recover to be proved, and you find that the deceased, Dethrage, lost his life in

the manner charged in the petition, and that the facts proved constituted negligence on the part of the city, and you find that Mr. Dethrage by the exercise of ordinary care could not have avoided the consequences to himself of that negligence, but you find, gentlemen, that he was to some extent negligent, and that his negligence contributed in some extent to his injury, you would still be authorized, gentlemen, to find for the plaintiff, but the amount of recovery ought to be reduced in proportion to the amount of default or negligence attributable to Mr. Dethrage in the matter."

(2) "Now, gentlemen, I charge you that it was the duty of the City of Rome to make and keep its streets in a reasonably safe condition for use and travel by the public in the ordinary way. That is to say, gentlemen, it is the duty of the city to keep its streets reasonably safe for ordinary travel, including such accidents as might, without fault on the part of the traveller, befall him." The defendant complained that the first of the above excerpts was error, and that the evidence did not warrant it; and that the second placed too great a duty upon the city regarding the care of its streets, and too great a responsibility for injury occasioned thereon.

*R. T. Fouché, McHenry & Maddox,* and *Seaborn & Barry Wright,* for plaintiff. *Halsted Smith,* for defendant.

ATKINSON, J. 1. From the evidence in this case it is clear that the jury were authorized in finding that the defendant was guilty of negligence in regard to the injury complained of. The fact that the city had allowed one of its public thoroughfares to be narrowed at one point to almost one half of its regular width by a deep ravine cutting into it, and had provided no railing, sidewalk, or other adequate means to prevent vehicles from passing over the edge of the roadway into the ravine, was sufficient evidence for the jury to find that the city was negligent in the care of the street. Having fixed the negligence of the defendant, the question would then present itself to the jury as to whether the deceased was himself guilty of any negligence in the premises, and, if so, whether to such an extent as to go only in mitigation of damages, or such as to altogether preclude recovery. The evidence justifies the conclusion that the deceased, in attempting to turn his horse and wagon in the road, was aware of whatever risk he was incurring on account of the character of the horse and the condition of the street; and it is the contention of the defendant that the act was voluntary

on the part of the deceased, and that therefore he assumed the risk attendant upon it, and no one could afterwards be heard to complain of the resulting injury.    But this conclusion does not necessarily follow; for whether one who knowingly and voluntarily incurs a risk caused by the negligence of another thereby forfeits all right of recovery for any damage that may ensue is a question that depends upon the character of the risk incurred.    This is made evident by the language of Justice Lumpkin in the case of *Samples* v. *Atlanta,* 95 *Ga.* 113, which is as follows: "Where the danger is exceedingly small and trivial, it may not be at all negligent to disregard it; where it is exceedingly great and obvious, it would be negligence *per se* to incur the hazard of being injured by it.    In other cases, it would be open to question whether such possible or probable hazard would be consistent with ordinary care; and in cases of this kind, the question of contributory negligence is one for determination by the jury."    In the case at bar, can it be said that the attempt to turn a horse of a balky disposition, hitched to a wagon, in a street 38 feet wide, bordered on one side by a gully some 12 or 15 feet deep, with trees growing between and forming a partial protection, was an act attended with such exceedingly great and obvious danger "that it would be negligence per se to incur the hazard of being injured by it?"    If not, then the question of negligence was one for the jury.    But it does not appear conclusively from the evidence that the deceased's act in attempting to turn at the narrow point in the road was purely voluntary; for it is to be gathered from the testimony of the boy who accompanied the deceased that before the attempt to turn was made the horse had become frightened at a jail-house ahead of him, and it might be that the attempt was made to turn at the particular place partly because of the necessity of removing as soon as possible the cause of fright from the vision of the animal.    This would be an additional element to be considered by the jury in determining whether the deceased acted with the care of an ordinarily prudent man.    The evidence also, on the questions of whether the deceased was guilty of negligence in his management of the horse when making the attempt to turn, and in not desisting, or making an effort to get out of the wagon, when he saw the first attempt or two was unsuccessful, was such as left the matter of his negligence in doubt and for determination by the jury.    Two of the witnesses testified

that he made three efforts to turn before the wagon was backed over the ravine. The witness driving with him testified that when the horse commenced backing, the deceased commenced beating him, and that the witness suggested to deceased to get out of the wagon. A fourth witness testified that the deceased hollered "Whoa" when the horse started to backing. Under this evidence, when consideration is taken of the fact that no rule can be laid down for the treatment of balky horses, and that the deceased, in the light of past experience, was probably in a better position than any one else to know what should be done under the circumstances, and of the further fact that he was about 50 years or more of age and crippled, it will be seen that his conduct in the matters of managing the horse and caring for his own safety can not be characterized necessarily as negligent. Under these facts can it be said that the judge properly exercised his discretion in granting a second new trial? The liberality of indulgences by this court in favor of the discretion of the trial court in the first grant of a new trial will not be extended to a second. In the first instance the discretion will be sustained, when questions of evidence are involved, almost as a matter of course; but not so with subsequent trials. There must be an end to litigation; and after the first grant of a new trial, if the matter in controversy be one of fact for the jury, and for a second time in passing upon the same facts the verdict upon the question at issue be concurrent with the first, the mere discretion of the court can play but little part in the second motion for a new trial. It is true that it may sometimes be exercised, but only in cases where it is palpably apparent from the entire evidence, that the verdict was strongly and decidedly against the weight of the evidence and manifestly wrong. The leading cases sustaining second grants of motions for new trial are *Taylor* v. *Central Railroad Co.,* 79 *Ga.* 330, *Wood* v. *Lane,* 102 *Ga.* 199, *Davis* v. *Chaplin,* 102 *Ga.* 587, *Daniels* v. *Leonard,* 105 *Ga.* 841, and cit. On account of the nature of the question on which the sufficiency of the evidence turns in this case, it is a difficult matter for the court to say, the facts being complicated, that the verdict is unwarranted by the evidence. The fact of negligence is one peculiarly for the determination of the jury, for the reason that it is not capable of direct proof, but is an inference derivable from other facts put in evidence; and where there may be a difference of opinion, the jury is the only

proper tribunal to draw this inference.　See *Perry* v. *Macon R. Co.*, 101 *Ga.* 408.　It is the policy of the law, under these circumstances, not to interfere with the second verdict of a jury.　In the case of *Cleveland* v. *Central R.*, 73 *Ga.* 793, where the action was for homicide of plaintiff's husband, and the defense contributory negligence, this court held that it was error for the trial judge to set aside a second verdict of the jury on the ground that it was excessive, where there was enough evidence to support it, although the decision of the trial judge in setting aside the first verdict for the same amount, and based upon the same evidence, was upheld by the court.　In *Cook* v. *Western & Atlantic R.*, 72 *Ga.* 48, in a similar action and defense, where the court on a former writ of error had decided that the evidence was sufficient to withstand a motion for nonsuit, it was held that the "discretion of the presiding judge in granting the first new trial had been exhausted in the case, and the grant of another was error."　Also in the case of *Dempsey* v. *Rome*, 99 *Ga.* 192, the court, having previously decided that it was error to grant a nonsuit on the same evidence as was then before it, held that a second grant of a new trial was error where the case turned upon the credibility of witnesses, and it appeared that if the jury choose to believe those introduced by the plaintiff, their evidence was amply sufficient to warrant a recovery.　In the present case the action was for the death of another, and the defense one of contributory negligence; the verdict of the jury was the second one found in favor of the plaintiffs; there was evidence to support it, and it was not excessive.　Under the evidence as a whole it is not palpable that the verdict is manifestly wrong, and accordingly we can not uphold the judgment of the trial court on the idea that as a mere matter of discretion it had the right to grant the second new trial.　The evidence being sufficient to support the verdict and there being no ground in this instance for the exercise of the court's discretion, it follows that it committed error in granting the new trial as prayed.

2. In the light of the entire charge, the portions thereof complained of are not erroneous for any reasons assigned.

*Judgment reversed.　All the Justices concur, except Fish, C. J., absent.*